ROULSTON v TENDERCARE (MICHIGAN), INC

Docket No. 208342. Submitted July 7, 1999, at Grand Rapids. Decided January 7, 2000, at 9:00 A.M.

Laura A. Roulston brought an action in the Mason Circuit Court against Tendercare (Michigan), Inc., and Baywood Nursing Home, assumed name of Tendercare Select Properties, Inc., alleging violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.*, and claiming that her employment was terminated in retaliation for her reporting to state investigators incidents of suspected resident abuse at the Baywood Nursing Home. The court, Richard I. Cooper, J., entered a judgment in favor of the plaintiff consistent with the jury's verdict. The defendants appealed.

The Court of Appeals *held*:

1. The circumstantial evidence was such that a reasonable juror could find that the plaintiff was discharged for retaliatory reasons, even if the defendants had mixed motives for the discharge. The evidence indicated that retaliation for protected activity under the WPA, not the plaintiff's alleged poor performance, was a motivating factor in the decision to discharge her. The proofs could sustain a reasonable inference that the plaintiff's alleged poor performance was really a pretext for retaliation on the part of the defendants. The plaintiff presented sufficient evidence to raise a triable issue of fact that she was discharged in violation of the WPA. The court correctly denied the defendants' motion for a directed verdict that alleged that the plaintiff failed to present a prima facie case under the WPA.

2. The court did not abuse its discretion in denying the defendants' motion to exclude evidence regarding the state's investigation of an incident at the nursing home and the outcome of the investigation. The evidence was relevant to a determination whether the defendants' proffered business reason for the plaintiff's discharge was unworthy of credence. The judgment must be affirmed and the matter must be remanded for a determination of appropriate appellate attorney fees.

Affirmed and remanded.

1. WHISTLEBLOWERS' PROTECTION ACT — WORDS AND PHRASES — PROTECTED ACTIVITY.

"Protected activity" under the Whistleblowers' Protection Act consists of reporting to a public body a violation of a law, regulation, or rule, or being about to report such a violation to a public body, or being asked by a public body to participate in an investigation (MCL 15.362; MSA 17.428[2]).

2. WHISTLEBLOWERS' PROTECTION ACT — PRIMA FACIE CASE.

A prima facie case under the Whistleblowers' Protection Act is established where the plaintiff shows that the plaintiff was engaged in protected activity as defined by the act, the defendant employer discharged the plaintiff, and a causal connection exists between the protected activity and the discharge (MCL 15.362; MSA 17.428[2]).

3. WHISTLEBLOWERS' PROTECTION ACT — BURDEN OF PROOF.

The plaintiff in an action alleging the plaintiff's discharge from employment violated the Whistleblowers' Protection Act bears the initial burden of establishing a prima facie case of retaliatory discharge; if the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate business reason for the discharge; the plaintiff then has an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge; once the pretext question is reached, the question of mixed motive, i.e., retaliation plus legitimate business reason, must be considered; a plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence; factors for proving pretext include whether participation in a protected activity played any part in the discharge, whether the protected activity was a substantial factor in the discharge, whether the protected activity was the principal, but not sole, reason for the discharge, or whether the discharge would have occurred had there been no protected activity (MCL 15.361 *et seq.*; MSA 17.428[1] *et seq.*).

*Twohey Maggini, P L C* (by *Arthur B. DeBruyn*), for the plaintiff.

*Bensinger, Cotant, Menkes & Aardema* (by *Dale L. Arndt*), for the defendants.

Before: MCDONALD, P.J., and KELLY and CAVANAGH, JJ.

Per Curiam. Defendants Tendercare (Michigan), Inc., and Baywood Nursing Home, assumed name of Tendercare Select Properties, Inc., appeal as of right from a jury verdict finding them liable for violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*; MSA 17.428(1) *et seq.* We affirm and remand for a determination of reasonable appellate attorney fees.

Plaintiff, Laura Roulston, holds a bachelor's degree in psychology. She was hired in January 1996 to serve as social services director at defendant Baywood Nursing Home located in Ludington. She claimed that her employment was terminated in retaliation for reporting to state investigators incidents of suspected resident abuse. Robert VanRhee, the Baywood administrator who fired plaintiff, denied having any knowledge of the reports until after plaintiff's discharge. VanRhee testified that plaintiff's discharge was strictly a business decision based on deficiencies in her job performance, which included being confrontational with staff, being slow and failing to complete paperwork, and being late for or failing to attend meetings.

On June 8, 1996, at 10:25 A.M., Vera Reed, a resident of the Baywood facility, passed away. When plaintiff learned of the death, she looked in on Helen Bennett, who had been Reed's roommate for two years. Plaintiff found Bennett, crying and seemingly distressed over Reed's death, sitting in her wheelchair with the wheels in the locked position, and with Reed's body still lying on her bed. Plaintiff testified that she believed Bennett had been left in the room as a form of punishment. Defendants claimed that Bennett had been confined to her wheelchair following her morn-

ing shower, during which time she had become agitated. Defendants also stated that, because Bennett had been diagnosed as suffering from dementia, she was mentally incapable of comprehending Reed's death.

Plaintiff was moving Bennett away from her room when she met the undertaker and a Baywood aide on their way to attend to Reed's body. The aide's comments led plaintiff to believe that she had forgotten Bennett had been left in the room. Plaintiff later spoke to Sheryl Nelson, the charge nurse, and inquired about Bennett's being left in the room with Reed's body. Allegedly, Nelson became angry and shouted that plaintiff did not know what was going on. Nelson testified that she had no other place to put Reed's body pending viewing by the family and removal by the funeral home. She also testified that she had put Bennett in her room to separate her from the other residents until she calmed down. Records showed that Reed's body was moved to the funeral home at 12:20 P.M.

Plaintiff testified that she also notified the director of nursing, Patsy Sherman, about the incident, and that Sherman recommended doing nothing until the following Monday, June 10, 1996, when VanRhee could be consulted. Sherman testified that she began investigating the alleged abuse on Monday. It was revealed at trial that Sherman complained two or three times regarding plaintiff's method of approach when dealing with the staff in the nursing department. Sherman testified that she did not learn that plaintiff had reported the Bennett incident to state investigators until after plaintiff's employment had been terminated.

On Sunday, June 9, 1996, plaintiff wrote a letter to VanRhee describing the incident with Bennett. The next morning, plaintiff put the letter in VanRhee's office. Plaintiff claimed to have noted the incident in Bennett's chart after she spoke to Fran Brennan, assistant director of nursing, regarding how much detail should be noted. Brennan told her not to indicate that there had been a dead body in the room with Bennett.

Plaintiff believed that Bennett's treatment constituted abuse. On the night of Monday, June 10, 1996, she called an advocacy group for senior citizens regarding the Bennett incident. The individual she spoke to informed her that she could be fined if she did not report the incident. Sometime thereafter, plaintiff contacted Jeanette Baldwin, a social worker at a Tendercare facility in Lansing, for input on what she should do regarding reporting the incident. VanRhee testified that, if an incident involving a resident is unintentional, he did not consider it to be abuse.

On the afternoon of June 11, 1996, VanRhee conducted plaintiff's ninety-day employee evaluation. At that point, plaintiff had been on the job for more than four months. VanRhee testified that his review of plaintiff's performance followed a conversation he had with Tim Stoll, defendants' social services and activities consultant. VanRhee graded plaintiff "average" in every area of concern except "cooperation/teamwork," which was graded "poor." He noted that plaintiff was confrontational with staff and that she reacted before she had all the facts. He acknowledge that plaintiff's position was described as being an advocate for the nursing home residents, but

denied that being an advocate would put her at odds with the staff. He also noted that plaintiff had poor attendance at meetings and that she failed to complete paperwork on time. After the review, VanRhee extended plaintiff's probation period for another ninety days. He refused to discuss the Bennett incident.

The following morning, Wednesday, June 12, 1996, plaintiff documented her observations regarding Bennett, including that Reed's body had been left in the room. Plaintiff did not go to work the following two days, but, instead, stayed home and reported her suspicions of abuse to the Department of Consumer and Industry Services and to the Health Care Fraud Unit of the Attorney General's Office.

Plaintiff testified that, in the week following her report to the state, she observed two more incidents of alleged abuse at the nursing home. In the first, Gladys French, a resident, was moved from one room to another. Plaintiff believed the action was not in the resident's best interest because she suffered from dementia and became disoriented when moved. The second incident involved Doris Schrader, a resident who had declined to complete an advance care directive form and had indicated that she wanted full medical treatment in the event of an emergency.

On June 19, 1996, plaintiff was informed by the nursing staff that Schrader needed to change her advance care directive. Plaintiff went to Schrader's room, where she found Schrader wearing an oxygen mask and asking to be taken to the hospital. When Schrader collapsed and plaintiff realized the seriousness of her illness, she called Schrader's son, who indicated that he did not know what course of action

to follow and that he would call back after speaking with his uncle. Apparently, a nurse telephoned Schrader's physician, who instructed the facility not to do anything because Schrader was a terminally ill patient. Plaintiff believed that Schrader had the right to have her wish for full medical treatment followed, regardless of whether her son or her physician agreed. Before Schrader's son called back, and before plaintiff could take any action, Schrader died. Although plaintiff did not discuss this incident with anyone at Baywood, she did report it to state investigators after her employment was terminated.

The state investigation of the Schrader incident revealed that the nursing home had a policy of providing aggressive emergency resuscitative measures, and that, on the basis of that policy, Schrader saw no need to complete an advance directive on her admission to the facility. At the time Schrader expired, she was considered by the facility staff to be a "full code" resident and that she should have received aggressive emergency resuscitative measures. The state investigation concluded that those measures were not provided. VanRhee and Stoll testified that there was no requirement that a resident sign an advance directive, and that a resident with no advance directive would be treated no differently than a resident with a "full code" advance directive. VanRhee claimed that plaintiff's failure to compel Schrader to complete an advance directive contributed to his decision to terminate her employment. However, plaintiff was not responsible for admitting residents, and Schrader's admission to the nursing home had been handled by an in-take person. It was noted that Schrader was not suffering from any mental incapacity, that she

declined to complete an advance care directive, and that she expressed a wish for full resuscitative measures.

Plaintiff testified that, on the morning of June 21, 1996, she spoke with Stoll. Plaintiff told Stoll of her concerns regarding resident care and specifically mentioned the incidents involving Bennett, French, and Schrader. Stoll allegedly cautioned plaintiff against using the term "abuse" to describe the situations. Plaintiff testified that she and Stoll were arguing over what constituted "abuse" and that Stoll told plaintiff that she "needed to be like everybody else and start thinking like they did." Plaintiff testified she then blurted out: "Tim, I have spoke [sic] to people at the state. And they have told me that all of these things that I have brought up are serious and need to be investigated. And it's not just me that is concerned about these situations."

Sometime that same morning, VanRhee contacted Tendercare's regional director to discuss plaintiff's termination. The regional director directed VanRhee to discuss the matter with George Herron, Tendercare's vice president of human resources. When plaintiff returned from her lunch break, VanRhee and Sherman met her in her office. Plaintiff described VanRhee as "angry, red in the face." VanRhee told plaintiff, "You're through." He stood by while plaintiff gathered her belongings and left the building. Plaintiff theorized that after she told Stoll that she had reported her suspicions of abuse, he contacted VanRhee, who, in turn, terminated plaintiff's employment.

After plaintiff rested, defendants moved for a directed verdict on the ground that plaintiff had failed

to present a prima facie case under the WPA. Specifically, defendants argued that they did not know plaintiff had reported her concerns to state investigators and that it was merely a coincidence that plaintiff's employment was terminated shortly thereafter. Defendants argued that, besides the coincidence in timing, plaintiff had presented no other evidence from which the jury could infer causation. The trial court denied the motion, ruling that the circumstantial evidence was such that a reasonable juror could find that plaintiff was discharged for retaliatory reasons, even if defendants had mixed motives for the discharge. We agree.

The determination whether evidence establishes a prima facie case under the WPA is a question of law that this Court reviews de novo. *Phinney v Perlmutter*, 222 Mich App 513, 553; 564 NW2d 532 (1997). This Court also reviews a trial court's denial of a motion for a directed verdict de novo. *Meagher v Wayne State Univ*, 222 Mich App 700, 708; 565 NW2d 401 (1997). On appeal, this Court must review all the evidence presented up to the time of the motion to determine whether a factual question existed. *Kubczak v Chemical Bank & Trust Co*, 456 Mich 653, 663; 575 NW2d 745 (1998); *Hatfield v St Mary's Medical Center*, 211 Mich App 321, 325; 535 NW2d 272 (1995). This Court views the evidence in the light most favorable to the nonmoving party, grants that party every reasonable inference, and resolves any conflict in the evidence in that party's favor. *Id.*

The WPA provides, in pertinent part, as follows:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of

employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [MCL 15.362; MSA 17.428(2).]

"Protected activity" under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule, (2) being about to report such a violation to a public body, or (3) being asked by a public body to participate in an investigation. MCL 15.362; MSA 17.428(2).

To establish a prima facie case under the WPA, plaintiff must show that (1) she was engaged in a protected activity as defined by the act, (2) the defendants discharged her, and (3) a causal connection existed between the protected activity and the discharge. *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). Defendants do not dispute that they discharged plaintiff after she engaged in a protected activity. However, as noted, defendants do challenge plaintiff's proof of the causal connection between the activity and the discharge.

" '[A]n employer is entitled to objective notice of a report or a threat to report by the whistleblower.' " *Roberson v Occupational Health Centers of America, Inc*, 220 Mich App 322, 326; 559 NW2d 86 (1996), quoting *Kaufman & Payton, PC v Nikkila*, 200 Mich App 250, 257; 503 NW2d 728 (1993). The testimony presented up to the time of defendants' motion for a directed verdict reasonably supported the inference

that Stoll had notified VanRhee of plaintiff's allegations. Viewing this evidence in the light most favorable to plaintiff, defendants had objective notice that plaintiff had reported her suspicion of abuse to state regulators. *Hatfield, supra* at 325.

Defendants also argue that plaintiff failed to prove a connection between the protected activity and her discharge because she relied solely on the timing of events as evidence of retaliation. Relying on federal cases decided under specific federal acts, defendants argue that the mere fact that plaintiff was discharged hours after defendants allegedly learned of plaintiff's protected activity was insufficient to support an inference of retaliation. However, as the trial court correctly noted, other factors concerning plaintiff's discharge tend to support an inference of notice. The extent of VanRhee's anger, being red in the face, his abrupt "you're through," as well as his standing by until plaintiff removed her belongings and left the building, all suggest that VanRhee had talked to Stoll and learned that plaintiff had reported the Bennett incident to the state.

Defendants also argue that, even if there is a link between plaintiff's whistleblowing and her discharge, it is insignificant in light of the articulated reasons for plaintiff's firing. This Court has found that the WPA bears substantial similarities to Michigan civil rights statutes and that actions under the WPA are analyzed using the "shifting burdens" framework utilized in retaliatory discharge actions under the Civil Rights Act, MCL 37.2101 *et seq.*;   MSA 3.548(101) *et seq. Anzaldua v Band*, 216 Mich App 561, 580; 550 NW2d 544 (1996). Thus, the plaintiff bears the initial burden of establishing a prima facie case of retaliatory dis-

charge. *Hopkins v Midland,* 158 Mich App 361, 378; 404 NW2d 744 (1987). If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate business reason for the discharge. *Id.* If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only a pretext for the discharge. *Id.*

Once the pretext question is reached, the question of mixed motive, i.e., retaliation plus a legitimate business reason, must be considered. *Melchi v Burns Int'l Security Services, Inc,* 597 F Supp 575, 583 (ED Mich, 1984). The *Melchi* court offered four standards for proving pretext in a retaliatory discharge case: (1) whether participation in the protected activity played any part in the discharge, no matter how remote, (2) whether the plaintiff's protected activity was a substantial factor in the discharge, (3) whether the plaintiff's protected activity was the principal, but not sole, reason for the discharge, or (4) whether the discharge would have occurred had there been no protected activity. A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Hopkins, supra* at 380.

VanRhee and Stoll both admitted that plaintiff inherited a paperwork backlog from her predecessor. VanRhee rated plaintiff "average" in all but one employment performance category. This, coupled with the fact that plaintiff was discharged within hours of telling Stoll she had reported her suspicions

of abuse, is further evidence that retaliation, not plaintiff's performance, was a motivating factor in the decision to discharge her. For these reasons, we find, giving the benefit of any reasonable doubt to the non-moving party, that plaintiff's proofs could sustain a reasonable inference that her performance was really a pretext for retaliation on the part of defendants. Accordingly, we hold that plaintiff presented sufficient evidence to raise a triable issue of fact that she was discharged in violation of the WPA. The trial court correctly denied defendants' motion for a directed verdict.

Defendants also argue that the trial court erred in denying their motion to exclude evidence that they had received a citation from the state regarding Schrader's care. A trial court's decision to admit evidence is within its sound discretion and will not be disturbed absent an abuse of discretion. *Chmielewski v Xermac, Inc*, 457 Mich 593, 614; 580 NW2d 817 (1998). An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say there is no justification or excuse for the ruling made. *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 188; 600 NW2d 129 (1999).

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Generally, all relevant evidence is admissible, and irrelevant evidence is not admissible. MRE 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion of

the issues, waste of time, or misleading the jury. MRE 403.

Evidence of the Schrader incident was clearly probative of the issues in this case, because defendants claimed that plaintiff was discharged, in part, because of her failure to secure an advance care directive and her overreaction to the incident. The evidence was prejudicial to defendants. However, MRE 403 calls for the exclusion of probative evidence when "substantially" outweighed by prejudicial considerations. Evidence regarding the state's investigation of the Schrader incident and the outcome of the investigation was relevant to a determination whether defendants' proffered business reason for plaintiff's discharge was unworthy of credence. The trial court did not abuse its discretion in denying defendants' motion to exclude the evidence.

Affirmed and remanded to the trial court to determine appropriate appellate attorney fees.