NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0495n.06
Filed: July 14, 2006

No. 05-1730

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DENA M. ALLEN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHARTER COUNTY OF WAYNE; | ) | EASTERN DISTRICT OF MICHIGAN |
| RALPH KINNEY; PHILIP ABRAHAM, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

Before: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Dena Allen claims to have been terminated from her position with defendant-appellee Charter County of Wayne ("Wayne") because she threatened to provide information about corrupt internal practices to a state auditing commission. Accordingly, she brought suit in state court against Wayne and the individuals who dismissed her – Phillip Abraham and Ralph Kinney. The suit alleged: (1) a violation of the Michigan Whistleblower's Protection Act ("WPA"), Mich. Comp. Laws § 15.361; (2) a violation of public policy; (3) tortious interference with a contractual and/or employment relationship; and (4) denial of due process under the Fourteenth Amendment. Following removal to federal district court, summary judgment was granted to Wayne on all counts. We affirm.

1

In 2000, Allen was hired by Arrow Strategies ("Arrow")[1] to work as a data analyst. At all times, Allen's employment contract stated that she was an at-will employee who could be terminated at any time. Her contract further stated that she was paid by Arrow, her unemployment insurance and FICA contributions were managed by Arrow, and she was subject to Arrow's company policies. Finally, the contract contained a clause mandating that the employee keep confidential all client information.

Throughout her employment with Arrow, Allen was assigned to work at the Wayne County Department of Community Justice ("DCJ"). This work was done pursuant to a contract for Arrow to provide computer workers to Wayne. The only two parties to the contract were Arrow and Wayne, and all provisions of the contract relate only to these parties. The only mention of Allen in the contract is as "Personnel" in Appendix A. The parties were free to substitute another individual into Allen's position should such action be necessary.

Allen's primary duty at DCJ was to maintain a database run by the Division of Adult Services ("adult services database"), on which she worked over 40 hours each week. She also routinely performed a minimal amount of work on tasks not related to adult services, including the compilation of the juvenile services database. Allen's salary was drawn from a Michigan grant referred to by the parties as "Act 511." The purpose of the grant was to provide funding for the DCJ's Adult Services division. Allen contends that individuals paid with Act 511 funds were required to exclusively work on adult services. Wayne counters that no violation of Act 511 would

---

[1] At the time of her hire, Arrow was known as Quantum Computer Consultants. Arrow purchased Quantum in late 2002, but the company's relationship with Allen did not change in any way relevant to this proceeding. Thus, the company will be referred to as "Arrow" throughout this opinion.

occur so long as an individual paid with the funds worked at least 40 hours each week on adult services. Regardless, it is undisputed that: (1) Allen spent at least 40 hours each week on adult services work and (2) Allen performed at least a minimal amount of non-adult services work throughout her time at DCJ.

In 2003, a change in leadership following an election caused a shake-up in Wayne County personnel. The former heads of DCJ (Jeriel Heard) and Adult Services (Dennis Shrantz), with whom Allen was friends and had a good working relationship, were replaced with new appointees – Ralph Kinney to head DCJ and Barbara Sampson as Director of Adult Services. In addition, Phillip Abraham was appointed as the Director of Information Technology at DCJ. Shortly after Abraham started at DCJ, he went to lunch with Allen and Shrantz. The accounts of this lunch vary widely, with Abraham claiming that Allen and Shrantz threatened him and used foul language, and Allen and Shrantz averring that the meeting had only one heated moment. Allen does not dispute, however, that Abraham asked her hypothetically what her response would be if requested to do some juvenile service work on a regular basis and that she responded that the hypothetical person could "kiss my ass."

Later in 2003, DCJ became aware that the State of Michigan intended to audit the DCJ and the Division of Adult Services. Sampson held a meeting with her staff, including Allen, and informed them that the state auditor might question them about their job functions. Allen alleges that she announced at the meeting that, if asked directly, she would say that she was being forced to perform juvenile services work in violation of Act 511. She admitted in her deposition, however, that she had no intention of affirmatively seeking out the state auditors or giving them any information about DCJ unless she was specifically asked. She also admitted that she had no evidence that she informed anyone of her intent to report her juvenile justice work to state auditors.

3

The only contact Allen had with any state officials was one conversation with an investigator that concerned a separate issue and occurred after she was terminated.

There was some concern at DCJ, however, about *other* information that Allen had provided to the Wayne County Prosecutor's Office. With the permission of Arthur Carter, the new head of DCJ,[2] Allen sent information to Jeriel Heard, the former director of DCJ who had moved to the Prosecutor's Office. The documents sent concerned a joint initiative to expunge the records of first-time felons and had nothing to do with Act 511 or Allen's job duties. On May 15, 2003, Abraham pulled Allen aside and requested that she sign a memorandum of understanding concerning her position and the method by which she would respond to information requests. Allen refused to sign the memorandum because she felt it incorrectly categorized her as an IT employee. The next day, Allen sent more information (again regarding the joint initiative) to the Prosecutor at the direction of her supervisors.[3] She also requested a meeting (which was never held) to clarify her role at DCJ.

On May 18, 2003, Arrow informed Allen that Kinney and Abraham had decided to end her assignment with Wayne County. The reason stated on a form provided by Wayne was that she was "having a hard time getting along with the new administration." In an affidavit, Kinney stated that Abraham and he were the sole decision-makers and that Allen was asked not to return because of "personality issues" and "insubordination," including the "kiss my ass" comment and the refusal to sign the memorandum. Abraham averred that he was having problems, both with Allen's attitude

---

[2] In March 2003, Kinney was demoted from director at DCJ to deputy director. Carter succeeded him as director.

[3] In its Order Denying Reconsideration, the district court correctly noted that Allen's reporting of this information did not provide grounds for termination, because she was simply following the directions of her supervisors, including Sampson and Carter, in sending the information to the Prosecutor.

and with her job performance. Kinney testified that he felt bad that Allen was being terminated over a personality conflict and that he hoped she would be re-located elsewhere.

Allen filed suit in state court in July 2003, and the case was subsequently removed to federal district court. The district court granted summary judgment to Wayne on all counts and denied Allen's subsequent motions for rehearing and to reopen discovery. Allen filed this timely appeal.

## II.

This court reviews *de novo* a district court's grant of summary judgment. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 657 (6th Cir. 2000). Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## A.

To make out a *prima facie* case under the WPA, Allen must show that: (1) she engaged in a protected activity under the WPA; (2) she was discharged or suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998); Mich. Comp. Laws § 15.362. If a plaintiff successfully sets forth a *prima facie* case, the employer has the burden to show a legitimate, nondiscriminatory and non-pretextual reason for the adverse employment action.

5

*Hazle v. Ford Motor Comp.*, 628 N.W.2d 515, 521-22 (Mich. 2001). Allen's claim fails because she cannot show either that she engaged in protected activity or that a causal connection exists between any protected activity and her dismissal.

Examples of "protected activity" include: "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler*, 572 N.W.2d at 212. To qualify, Allen must have engaged in one of these activities. She does not contest that, at the time of her dismissal, she had taken no steps to report the perceived misconduct and she was not asked to participate in an investigation. Allen claims only that she was "about to" report the Act 511 violations to the state auditor.

Allen has not made a sufficient showing to support this claim. The protections of the WPA do not extend "to one who is perceived to be a whistleblower, but who has not otherwise engaged in protected activity as defined by the act." *Chandler*, 572 N.W.2d at 216. The plaintiff in *Chandler* was fired because his employer mistakenly believed that he had reported a legal violation to the authorities. *Id.* at 212. The Michigan Supreme Court ruled that the WPA did not apply to his case because he never had any intent of reporting the violations. *Id.* at 215-16. In *Shallal v. Catholic Social Services of Wayne County*, the same court stated that a plaintiff's conditional threat to report her supervisor's alcohol abuse and mismanagement entitled him to protection under the WPA. 566 N.W.2d 571, 576 (Mich. 1997). The plaintiff told her employer, "If you don't straighten up . . . I will report [you]," *id.*, and the court ruled that this was protected activity under the statute.

> Plaintiff's conditional threat to her employer was credible evidence that she had finally decided that she was going to report him. Giving her employer the opportunity to correct his behavior does not in any way affect whether she had formed the requisite intent to report her supervisor. In fact, her threat furthered the public policy goal of the statute, which is to combat the corruption or criminally

6

irresponsible behavior of employers. A plaintiff should not be required to say "magic words" in order to reap the protections of the statute. It should be sufficient that plaintiff actually threatened to report her employer.

*Id.* at 577. Thus, our inquiry focuses on whether Allen had formed the necessary intent to report the illegal activities to the state auditor or if she was only "perceived" as a whistleblower.

Allen has put forth no evidence that she formed an intent to volunteer information to the authorities. In her deposition, she stated that she would report on the perceived violations of Act 511 only if she was asked. Allen admitted, "I was hesitant to go to the audit because if I were asked, I would have to report that I was working on juvenile justice work." In later questioning, Allen reaffirmed that she had no intention of seeking out the state auditors:

> Q:     If the people from the State of Michigan never even saw you when they came in to do their review and never made any attempt to contact you, what did you – what were your intentions?
> A:     Nothing.
> Q:     So if they didn't ask you anything, you had no intentions of telling them anything about the fact that you did juvenile justice work?
> A:     No.

In her brief, Allen once again states only that "she would not lie" if questioned by the state auditors. Unlike the conditional threat in *Shallal*, Allen does not appear to have made any threat at all. In fact, she specifically admitted in her deposition, "I didn't make any threats to anybody." She also stated that her announcement could not be characterized as "a promise to report" or even "an intention to report." Thus, it appears that even under *Shallal*, Allen did not have the requisite intent to qualify her activity for protection under the WPA. At most, she was "perceived" as a whistleblower by her superiors, which does not qualify as protected activity under the statute.

Moreover, Allen has made no showing of a causal connection between any protected activity and her dismissal. To the district court, Allen argued that the temporal proximity of her firing to the alleged activity was sufficient to survive summary judgment. Following clear Michigan law, the

7

district court did not accept this argument. On appeal, Allen raises the exact same argument, and in fact, devotes only two sentences to challenging the district court's holding on this issue:

> On the eve of the audit taking place on May 21, 2003, Appellees Kinney and Abraham fired Appellant, thus preventing her from advising the state auditor, Mr. Weissenborn, of the corruption within the Department of Community Justice. The timing of the discharge to the date of the audit is so close as to prove a causal connection!!

Despite her emphatic exclamation, Allen has put forth no legal argument to counter the one made by the district court and Wayne. Michigan law clearly states that "[s]omething more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *West v. General Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000)). Allen has made no such showing. She has put forth no evidence that anyone other than Sampson was aware of her intentions, and she does not claim that Sampson had anything to do with her termination. She explicitly states in her brief that "Kinney and Abraham fired [her]." Allen further admitted in her deposition that she has no evidence that she informed anyone other than Sampson of her intention to report Act 511 violations to the state auditors. As Allen has not shown a causal connection, she cannot make out a *prima facie* case under the WPA and summary judgment is appropriate.

B.

Allen contends that if her WPA claim is dismissed, she should be allowed to bring a claim for violation of Michigan public policy. However, under Michigan law, "[a] public policy claim is sustainable . . . only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Dudewicz v. Norris-Schmid, Inc.*, 503 N.W.2d 645, 650 (Mich. 1993). Where a statute specifically proscribes the conduct at issue, "Michigan courts have

consistently denied a public policy claim." *Id.* Because the WPA specifically prevents employers from retaliating against employees who report, or intend to report, illegal practices to the authorities, Allen cannot bring a claim that her dismissal for these reasons violates public policy. *See id.*

C.

Allen next appeals the dismissal of her claims for tortious interference with a contractual or business relationship. To sustain this claim, Allen must show: (1) the existence of a valid business relationship (not necessarily evidenced by an enforceable contract); (2) knowledge of the business relationship on the part of Wayne; (3) an intentional interference by Wayne inducing a breach or termination of the business relationship; and (4) resultant damages. *See Aioi Seiki, Inc. v. JIT Automation, Inc.*, 11 F. Supp. 2d 950, 954 (E.D. Mich. 1998); *Northern Plumbing & Heating, Inc. v. Henderson Bros., Inc.*, 268 N.W.2d 296, 299 (Mich. App. 1978). Michigan law requires that "[o]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in the law  for the purpose of invading the contractual rights or business relationship of another." *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. App. 2002) (quoting *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. App. 1984)).

Allen's claims fail on a number of fronts. First, she has not alleged that Wayne acted in any way so as to induce Arrow to breach its contract with her. In fact, Allen does not claim that Arrow breached her employment contract, and there is no evidence that Arrow ever did so. She remained employed with Arrow following the end of her assignment with DCJ. Absent a breach of her employment contract, Allen cannot bring a claim for tortious interference. Contrary to the assertions made by Allen, she did not have a contract with Wayne and the contract between Wayne and Arrow was not for her specific services. The agreement simply listed her in the Appendix as "personnel,"

9

and Wayne retained the right to replace her at will. There is also no allegation that Wayne breached its contract with Arrow by requesting a different worker; rather, the contract continued until it expired of its own terms in September 2003.

Moreover, Allen cannot show that Wayne committed a "per se wrongful act" or acted with malice in asking her not to return to DCJ. Michigan law defines a "per se wrongful act" as "an act that is inherently wrongful or an act that can never be justified under any circumstances." *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich. App. 1992). If such an act cannot be shown, then Allen "must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *CMI Int'l*, 649 N.W.2d at 812. Such a showing must be made in order to survive summary judgment, *id.* at 812-13, and Allen cannot satisfy this requirement. She has put forth no evidence that the actions taken by Abraham and Kinney were unjustifiable, inherently wrongful, or in bad faith. Allen's only allegation is that she was dismissed without cause. Under Wayne's contract with Arrow, however, Kinney and Abraham had the right to replace Allen with a different worker because of their belief that she was not peacefully co-existing with the new administration. This action did not constitute tortious interference, and thus, summary judgment is appropriate.

D.

Allen's final claim is that her dismissal from DCJ violated her due process rights under the Fourteenth Amendment. The parties concede that Allen was a public employee and so we assume *arguendo* that she was, because in any event, Allen did not have a property interest in her at-will assignment at DCJ.

The analysis of a due process claim is a two-step inquiry. First, the court must determine if Allen has a property interest entitled to due process protection. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Property interests are not created by the Constitution; rather,

10

"they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law" or contracts. *Id.* If Allen has such a property interest, then the court must determine what process is due. *Id.* at 541. Allen claims a protected property interest in her assignment at DCJ and argues that Wayne violated her due process rights when it dismissed her from this assignment. She has made no showing, however, that she had any property interest in this assignment created by either contract or state law. Allen's sole argument is that she is an intended third-party beneficiary of the contract between Wayne and Arrow and that, under this contract, she was entitled to receive ten-days notice prior to a termination without cause.

There are several responses to this argument. One, Allen is not a third-party beneficiary to the Wayne-Arrow contract. Under Michigan law, a person is a third-party beneficiary of an agreement only if "the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for [the third party]." Mich. Comp. Laws § 600.1405. This test is objective; the subjective belief of the parties is irrelevant. *Oja v. Kin*, 581 N.W.2d 739, 744 (Mich. App. 1998). Neither Wayne nor Arrow agreed to do anything or refrain from doing anything for Allen. The contract does not even mention Allen, except as an example of "Personnel" in Appendix A. There is no evidence that Wayne made the contract with Arrow specifically to obtain Allen's services; indeed, the contract between the two parties continued after Allen was reassigned. Under Michigan law, it is not enough that Allen derived some benefit from the agreement. "Where the contract in question is primarily for the benefit of the parties thereto, the fact that a third person is incidentally benefitted does not give that third person rights as a third-party beneficiary." *Id.* Allen has not overcome the presumption under Michigan law that the contract was executed for the benefit of the parties making the agreement. *See id.*

11

Allen also was not entitled to any notice prior to her dismissal. The Arrow-Wayne contract provides that Wayne can terminate its agreement with Arrow without cause after providing ten days notice, or with cause at any time. The agreement makes no mention of any notice requirement for dismissing or reassigning the "personnel" provided by Arrow. The only contract that covers Allen, her employment contract with Arrow, has no notice requirement; rather, it states several times that she is an "at-will" employee who can be terminated at any time without cause. Thus, she has not shown the creation – by contract or otherwise – of any property interest in her assignment at DCJ. As we find no protected property interest, we need not decide whether Allen's dismissal from DCJ, when she remained employed with Arrow, constituted a termination of that interest. The due process claim was properly dismissed.

III.

We affirm the decision of the district court granting summary judgment to the defendants on all counts.