**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0045n.06

No. 08-2492

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jan 26, 2010**

LEONARD GREEN, Clerk

| | |
|---|---|
| MARY TALHELM, | ) |
| | ) |
| **Plaintiff-Appellant,** | ) |
| | ) |
| v. | ) |
| | ) |
| ABF FREIGHT SYSTEMS, INC., | ) |
| | ) |
| **Defendant-Appellee.** | ) |
| _____ | ) |

**ON APPEAL** FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

**O P I N I O N**

Before:  BOGGS, MOORE, and GIBSON,[*] Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Mary Talhelm ("Talhelm") appeals the district court's entry of summary judgment for her employer on her retaliatory-discharge claim under the Michigan Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 et seq.  Because there is no evidence that she was about to report a violation of law to a public body, we **AFFIRM** the district court's judgment.

## I.  BACKGROUND

### A.  Factual Background

ABF Freight Systems, Inc. ("ABF") is a freight carrier with terminals throughout the United States, including one in Flint, Michigan.  Talhelm began working for ABF as an administrative assistant at the Flint terminal in August 1988, and her husband Tim Talhelm became an ABF driver

---

[*]The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

in Flint that same year. In 2007, the Flint office staff consisted of David Pike, the terminal manager; Jeff McNamara, the sales representative; Jeremy Wasiliewski, the day-shift operations supervisor; Ashley Ward, the afternoon-shift operations supervisor; and Talhelm. Pike reported directly to Jeff Slobodnik, the regional vice president of operations, and Jerry Bergman, the regional vice president of sales. In turn, Slobodnik reported to Murray Babb, ABF's vice president of terminal operations, and Bergman reported to Jim Keenan, ABF's vice president of sales.

It is undisputed that throughout her time at ABF, Talhelm did exemplary work and was an asset to the company. Nonetheless, on July 10, 2007, ABF eliminated her position and Pike terminated her employment on the representation that the company had to cut costs.

Talhelm's termination was the culmination of a series of conversations among ABF's leadership on the fiscal health of the company stretching back to mid-2006. In July or August 2006, Pike met with Slobodnik and Bergman for his annual review. Without specifying a time frame, Slobodnik informed Pike that Pike might have to eliminate driver and office positions due to decreasing sales revenues and increasing costs.

On February 1, 2007, at Babb's insistence that all vice presidents reduce their supervisor payroll expenses, Slobodnik emailed the seventeen terminal branch managers in his region and instructed them to reduce office labor "as soon as possible." Slobodnik Email 2/1/07 (Record Entry ("R.E.") #22-9). If they were not able to make the needed cuts, they were to explain why. *Id.* At the time, the Flint terminal was third worst in the region in terms of meeting its target revenues per hour worked by office employees. Upon receiving the email, Pike responded the same day, writing, "Jeff, I have one full time office person (Mary) and she works no overtime." Pike Email 2/1/07 (R.E. #22-9). According to Pike, he "was opposed to getting rid of anyone." Pike Dep. at 26 (R.E.

2

#22-4). Slobodnik allowed Pike to postpone the decision, giving him time to increase revenues. Around this time, Talhelm became aware that cuts were being discussed.

In May 2007, Pike issued Tim Talhelm a written warning for calling in sick to attend a dentist appointment, rather than obtaining permission to take the time off. In response, Tim filed a grievance with the Teamsters union. After receiving a copy of the grievance on the morning of May 17, 2007, Pike allegedly approached Tim in an angry manner, pointed his finger at him, and said "you are going to pay for this." SSD Report (R.E. #22-11). That morning, Tim called ABF's Safety and Security Department ("SSD") to report Pike's conduct. Tim called SSD a second time that afternoon, reporting that his wife had seen Pike "tossing papers in anger in his office and that it was probably about the grievance." *Id.* He stated that he was "worried if any of this was going to jeopardize her job." *Id.* SSD also reported that Tim said he "heard that Dave and the sales rep are always going out to lunch together and charging their meals to their sales rep account and that they probably do not have customers with them." *Id.* On May 18, SSD alerted Slobodnik to the situation.

On May 21, Slobodnik traveled to Flint to investigate Tim's complaint. He interviewed Tim, Pike, Mary Talhelm, and several others. According to Slobodnik, Tim admitted that he had made up the allegations about expense-account fraud. Mary Talhelm told Slobodnik that Pike and McNamara were not working full days or making enough sales calls. She expressed a fear of losing her job due to her husband's complaint, and Slobodnik reassured her she had nothing to worry about.

Some time that month after Tim's clash with Pike, Pike allegedly entered the office slamming doors. Talhelm had "had enough with the violence." Talhelm Dep. at 84 (R.E. #22-3). She described the interaction in her deposition testimony:

Q. What violence are you talking about, slamming doors?

3

A. Slamming doors, slamming the phone, slamming computers, slamming chairs, calling the drivers assholes. Just very angry. Having his fists clenched.

* * *

Q. What did you do?
A. I told him if he didn't straighten up, I was going to report him.
Q. For what?
A. For everything. Violence, embezzlement, using company property. I didn't say it out loud. This is what I'm going to report him for.

* * *

Q. And he said what?
A. He didn't say anything. He looked at me, got red in the face, went in his room, picked up the phone, made a phone call, slammed the phone down, went back out on the dock, put his hands behind his back like he always does when he's mad.

*Id.* at 85-87. Talhelm did not tell Pike for what matters she would report him or that she would report him to anyone outside the company.

Also in May 2007, Talhelm used ABF's code-of-conduct hotline to make further allegations against Pike. Reaching ABF Chief Auditor Lavon Morton, Talhelm made her report anonymously, identifying herself as a supervisor. Talhelm complained that Pike had used the office's petty cash and stamps for personal use, that Pike and McNamara were buying lunch with company money, that they were not working full days, and that they were playing golf and pool during work hours. Morton told her that he would look into her allegations.

Thereafter, Babb informed Slobodnik about the anonymous call. He identified the caller as a "female supervisor in Flint." Slobodnik Dep. at 26 (R.E. #22-5). At the time, the only female supervisor at the Flint terminal was Ashley Ward. Keenan also informed Bergman of the call and requested an investigation into the Flint terminal's expense reports. The corporate office audited

4

Pike's expense account, and Slobodnik and Bergman interviewed Pike and McNamara, but no evidence of fraud was detected. Slobodnik never told Pike about the anonymous phone call.

In June 2007, Talhelm confronted Pike about his personal use of the office's petty cash. A maximum of $100 was kept in a lockbox at the terminal for office purchases. Only Pike had the key, and Talhelm was charged with managing and reporting the balance of money. When a person removed money, he or she was to leave a paper receipt inside. Talhelm claims that Pike routinely withdrew money without leaving a receipt. She has also admitted, however, that he always replaced the money within two or three weeks at most. Near the beginning of the month, Talhelm told Pike that "taking money out of petty cash was illegal, and that if he didn't stop, I was going to report it." Talhelm Dep. at 89. As in the May confrontation, she did not say to whom she would report Pike.

From late 2006 to June 2007, ABF's financial woes generally continued. ABF uses a metric known as the operating ratio to measure profitability. A ratio of 100 means that a terminal is breaking even; below 100 indicates a net profit and above 100 indicates a net loss. The Flint terminal recorded ratios of 102.1 for October 2006, 103.5 for November, 105.3 for December, 110.9 for January 2007, 106.8 for February, 98.5 for March, 103.5 for April, 91.3 for May, and 99.3 for June. The numbers show that ABF struggled with losses through most of this period, but turned a small profit in the second quarter of 2007. ABF had tried to reduce costs by selling trailers and reducing the number of tractors at the terminal between mid-2006 and mid-2007; it also cut the number of drivers from a high of twelve in previous years to seven in July 2007. Notwithstanding those efforts, in June 2007 the terminal's revenues were down 7.9% while its payroll expenses were down only 2.7%.

In late June 2007, Slobodnik told Pike that, due to the Flint terminal's poor performance, Pike would have to eliminate one of his office positions and cut driver hours. By that point, Pike had already reduced Talhelm's hours between January and July 2007. On July 10, Pike told Talhelm that he had to eliminate her position and terminate her employment for economic reasons. She then called Slobodnik, who confirmed the termination and told her that it was purely an economic decision. Slobodnik reminded her that he had previously warned of potential cutbacks in the region.

Slobodnik has agreed that it would have been logical to eliminate a supervisor position, as Flint's supervisor costs-to-revenue ratio was too high, but he does not believe that Pike could have done with fewer than two supervisors. Pike stated in his deposition that he cut Talhelm's position because its loss would be the least disruptive to terminal operations. He did not want to eliminate a supervisor, and he felt Talhelm's administrative duties could be absorbed by the remaining staff. Moreover, Talhelm herself had never been trained as a supervisor and could not serve as an operations supervisor in any case, because she would then have to oversee her husband in violation of ABF policy. According to ABF, to date Talhelm has not been replaced.

Talhelm never told anyone at the Flint terminal that she was going to report Pike's conduct to any entity outside the company. Further, she never in fact reported Pike or ABF to any outside agency—before or after her termination.

## B. Procedural History

Talhelm filed suit in federal district court on September 5, 2007. After discovery, ABF filed a motion for summary judgment, arguing that Talhelm could neither make out a prima facie case of retaliation under the WPA nor prove that ABF's stated reason for her termination was pretextual. After a hearing, the district court granted the motion and entered final judgment on November 7,

6

2008. The court held Talhelm could not show (1) that she had engaged in a protected activity, given the absence of evidence that she was about to report Pike to a public body outside ABF; (2) that Pike had objective notice that she was about to report him to a public body; (3) that there was a causal connection between her threats to report Pike and her termination; or (4) that ABF's financial reasons for terminating her were pretextual. Talhelm timely filed this appeal.

## II. ANALYSIS

### A. Standard of Review

This court reviews a district court's grant of summary judgment de novo. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Talhelm's Whistleblowers' Protection Act Claim

The WPA provides in relevant part:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

7

Mich. Comp. Laws § 15.362. The Michigan state courts have clarified that WPA claims are to be analyzed under the burden-shifting framework used in retaliatory-discharge claims brought under the state's Civil Rights Act, *id.* § 37.2101. *Anzaldua v. Band*, 550 N.W.2d 544, 552-53 (Mich. Ct. App. 1996). The plaintiff must first make a prima facie showing that her termination was retaliatory. *Roulston v. Tendercare (Mich.), Inc.*, 608 N.W.2d 525, 530 (Mich. Ct. App. 2000). The burden then shifts to the defendant to provide a legitimate, nonretaliatory explanation for terminating the plaintiff's employment. *Id.* Finally, the plaintiff must prove that the defendant's articulated reason was not the real reason for the termination but only a pretext. *Id.*

To make out a prima facie case of a WPA violation, a plaintiff must show (1) that she was engaged in a protected activity, (2) that she was discharged by her employer, and (3) that there was a causal connection between her protected activity and her discharge. *Shallal v. Catholic Soc. Servs.*, 566 N.W.2d 571, 574 (Mich. 1997). There is no dispute that the company terminated Pike. ABF challenges the other two elements, arguing that no reasonable jury could conclude that Talhelm engaged in a protected activity or was fired because of such activity. Consideration of the first element resolves the case.

The WPA contemplates three types of protected activity: reporting a violation of law, regulation, or rule to a public body; being about to report such a violation to a public body; and being asked by a public body to participate in an investigation or court action. *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998). Talhelm proceeds on the theory that she was about to report Pike's conduct.

The WPA specifies that for about-to-report claims, an employee must prove the protected activity "by clear and convincing evidence." § 15.363(4). The Michigan Supreme Court has

8

explained that the state legislature imposed a heightened standard of proof on about-to-report claims to avoid false charges of retaliation. *See Shallal*, 566 N.W.2d at 575-76 (quoting legislative history to explain that the WPA "intentionally reduces employee protection the more removed the employee is from reporting to a public body"). The state supreme court has repeatedly reaffirmed this standard, and the state's appellate court and the federal district courts have consistently applied it. *See, e.g.*, *id.* at 575; *Koller v. Pontiac Osteopathic Hosp.*, No. 229630, 2002 WL 1040339, at *3 (Mich. Ct. App. May 21, 2002) (unpublished opinion); *Sheiko v. Underground R.R.*, No. 277766, 2008 Mich. App. LEXIS 2476, at *8 (Mich. Ct. App. Dec. 16, 2008) (unpublished opinion); *Smith v. Gentiva Health Servs. (USA), Inc.*, 296 F. Supp. 2d 758, 762 (E.D. Mich. 2003).

Despite the unambiguous text of the statute and the ample precedent on point, Talhelm argues that at summary judgment, her evidentiary burden is somehow lower. She writes, "in opposing a motion for summary judgment, Plaintiff is only required to show a genuine issue of material fact." Appellant's Br. at 20 (citing *Lynd v. Adapt, Inc.*, 503 N.W.2d 766 (Mich. Ct. App. 1993)). It is settled, however, that a court must consider the burden of proof applicable at trial in determining whether a reasonable jury could return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986). To avoid summary disposition, then, Talhelm must show that there is sufficient evidence to allow a jury to conclude by clear and convincing evidence that she was about to report Pike to a public body for a violation or suspected violation of law when she was terminated. *Lynd* says nothing different. 503 N.W.2d at 767 (holding, without discussing the plaintiff's burden of persuasion, that the plaintiff had presented sufficient evidence to survive summary judgment).

With respect to the merits, Talhelm's clearest obstacle to relief is the absence of evidence that she intended to report Pike *to a public body*. Under the WPA, an employee must have intended to make her report to a public body, defined as any of various government entities or employees.[1] Talhelm has never stated, before or after her termination, that she threatened or even privately planned to report Pike to any government body. In her amended complaint, Talhelm alleged that she "clearly informed her supervisor, David Pike, that she was about to file a complaint with the local law enforcement authorities against David Pike." Am. Compl. ¶ 11. But in her deposition, she admitted that she never made that statement. Talhelm Dep. at 107. And in light of this disavowal, her claim that she told Pike "taking money out of petty cash was illegal" does not indicate that she intended to report him to police or prosecutors for embezzlement. Indeed, Talhelm has directly admitted that she never told "anybody at the Flint terminal" that she intended to report "any activity to any entity or agency outside ABF." *Id.* at 124.

---

[1]Mich. Comp. Laws § 15.361(d) defines "public body" as any of the following:
(i)   A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.
(ii)  An agency, board, commission, council, member, or employee of the legislative branch of state government.
(iii) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.
(iv)  Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.
(v)   A law enforcement agency or any member or employee of a law enforcement agency.
(vi)  The judiciary and any member or employee of the judiciary.

10

Nonetheless, Talhelm argues that under *Shallal* an employee "does not have to report a violation to a public body in order to be protected under the statute." Appellant's Br. at 22. *Shallal* states precisely the opposite. *See* 566 N.W.2d at 575 ("Shallal had the burden of establishing that a question of fact existed regarding whether she was 'about to' report Quinn's violations to a public body."). In that case, an employee brought a WPA claim after her termination against the nonprofit social service agency for which she had worked. The Michigan Supreme Court held that she had put forth enough evidence to show that she was about to report her supervisor to a public body for drinking on the job and misusing agency funds. *Id.* at 577. Talhelm claims her threat to Pike used precisely the same words as the plaintiff's threat in *Shallal*: "If you don't straighten up, I will report you." In fact, Talhelm used only some of the same words at issue in *Shallal*, leaving out the most crucial ones. There, the plaintiff told her supervisor, "if you don't straighten up . . . I will report [you] *to the department[,] to the board, anybody, everybody*." *Id.* at 576 (emphasis added). In the context of that case, "the department" clearly referred to the state Department of Social Services.

Revealingly, if Talhelm's interpretation were correct, she could proceed under the "reports" prong of the WPA—which triggers the lower preponderance-of-the-evidence standard of proof—based on her May 2007 call to ABF's code-of-conduct hotline. That she does not assert that she reported Pike is inconsistent with her interpretation of *Shallal*.

No cases support Talhelm's attempt to read the public-body requirement out of the statute. The relevant precedents are strictly to the contrary. *See, e.g.*, *Richards v. Metron Integrated Health Sys.*, No. 242502, 2004 WL 443991, at *2 (Mich. Ct. App. Mar. 11, 2004) (unpublished opinion) (nursing home employee did not meet the "public body" element when he threatened to report patient abuse to higher-ups at the company); *Roulston*, 608 N.W.2d at 530-31 (denying employer's motion

11

for summary judgment against employee who had reported suspected resident abuse at a nursing home to state investigators); *see also Allen v. Charter County of Wayne*, 192 F. App'x 347, 350-51 (6th Cir. 2006) (unpublished opinion) (holding that employee who admitted "that she had no intention of affirmatively seeking out the state auditors or giving them any information . . . unless she was specifically asked" could not establish a prima facie case).

The Michigan Supreme Court has recently reemphasized that the public-body element is the core of the WPA's reporting requirement. In *Brown v. Mayor of Detroit*, 734 N.W.2d 514 (Mich. 2007), the court confronted the WPA claims of a police detective and the head of the police department's professional accountability bureau, the former of whom publicly had been called a liar and the latter terminated after they reported allegations of misconduct by the mayor of Detroit and his security detail to the police chief and the mayor's office. The appeals court had required the officers to demonstrate that they made their report to a public body other than the one they worked in. The state supreme court rejected that requirement:

> The statutory language in this case is unambiguous. The WPA protects an employee who reports or is about to report a violation or suspected violation of a law or regulation to *a public body*. MCL 15.362. The language of the WPA does not provide that this public body must be an outside agency or higher authority. There is no condition in the statute that an employee must report wrongdoing to an outside agency or higher authority to be protected by the WPA. . . . It does not matter if the public body to which the suspected violations were reported was also the employee's employer.

*Id.* at 517. In clarifying that the body to which a report is made (or is about to be made) need not be external to or higher than a plaintiff's employer, *Brown* reaffirmed that it must be public.[2]

---

[2]ABF relies heavily on the federal district court case *Jennings v. County of Washtenaw*, 475 F. Supp. 2d 692 (E.D. Mich. 2007), which held that an employee of a county juvenile detention center who had expressed safety concerns to her supervisor, the county labor relations director, and a county human-resources employee could not sustain a WPA claim because she "only reported the

In short, Talhelm's interpretation of the statute is untenable given the specific "to a public body" clause in § 15.632 and the detailed definition of "public body" provided in § 15.631. The relevant state-court precedents uniformly apply the statutory requirement. Because there is no evidence, let alone clear and convincing evidence, that Talhelm was about to report Pike to a public body, the district court properly granted summary judgment to ABF.

## III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's judgment based on Talhelm's failure to establish a prima facie case of retaliation under the WPA. Accordingly, we need not address ABF's alternative arguments for affirmance.

---

alleged safety violations to her employer, not to a 'higher authority.'" *Id.* at 710. Based on several state-court cases, the district court in *Jennings* held that "[a]n employee does not engage in a 'protected activity' under the WPA by reporting unlawful conduct to her employer in the course of her employment—even if her employer is a public body." *Id.* Plainly, *Jennings* is no longer good law after *Brown*.

13