**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0237n.06

Case No. 13-2324

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Mar 31, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BUFFIE LYNN BURNS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| MAHLE ENGINE COMPONENTS USA, | ) | MICHIGAN |
| INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

BEFORE: DAUGHTREY, MCKEAGUE, and DONALD, Circuit Judges.

BERNICE B. DONALD, Circuit Judge. Buffie Lynn Burns appeals the district court's grant of summary judgment to Mahle Engine Components USA, Inc. ("Mahle"). Burns alleges that the district court erred in concluding (1) that she failed to allege a prima facie case of retaliation under Michigan's Whistleblower Protection Act, Mich. Comp. Laws § 15.362, and (2) that, even if Burns had established a prima facie retaliation claim, she still would have been unable to demonstrate that Mahle's legitimate non-discriminatory reasons for terminating her employment were pretextual. Burns also claims that the district court erred in granting summary judgment on her public policy claim that Mahle terminated her in violation of Michigan's common-law prohibition on firing at-will employees for refusing to break the law in the course of their employment. We **AFFIRM**.

I.

In November 2006, Burns began working as a chemical engineer at Dana Corporation's plant in St. John's, Michigan. After Mahle purchased the St. John's facility in March 2007, Burns continued to work as a chemical engineer for Mahle until April 2011 when she became Mahle's Environmental Health & Safety Coordinator for the St. John's plant. In this position, Burns reported to Rick Aubry, the human resources manager. Although plant manager Bruce Fandel had the final say over health and safety matters, Burns was "responsible for all environmentally related activities" at the site, which included "identifying compliance requirements associated with production processes, obtaining necessary environmental permits, preparing and submitting required environmental compliance reports, and conducting both formal and informal inspections to ensure proper compliance status." PageID 292, 602. Burns indisputably was an at-will employee. *E.g.* PageID 210, 289.

During a routine Michigan Department of Environmental Quality ("MDEQ") inspection in February 2012, Mahle learned of rules requiring a permit for the 1000 gallon anhydrous ammonia storage tank that had been at its St. John's facility since 1998. 312-17. Burns concedes that she should have been aware of the permit requirement before the inspection. Nick Zabrodsky of MDEQ's Air Quality Division Permit Section requested that Mahle submit a permit application during the one to six months that it would take him to complete his report but explained that if the application was not submitted by the time his report was finished, then he would simply add a submission deadline to the report.

Burns quickly completed a permit application, which she submitted to MDEQ on February 27, 2012. Among other things, the application requested information about the tank's proximity to other structures, including the "nearest residence, [or any] private or public

assembly." PageID 639. In this initial application, Burns "guestimate[d]" that the tank was 100 feet away from the nearest public or private assembly, a Masonic Temple across the street from the plant. PageID 233. When Zabrodsky informed Burns that the tank did not meet the minimum 300-foot distance from the nearest public or private assembly, Burns explained that she had only estimated the distance and that she would resubmit the application after she actually measured.

When Burns and David Knodel—the engineering manager for Allied Ring, the company that used the anhydrous ammonia as a part of a joint venture with Mahle—actually measured, they found that the Masonic temple was more than 300 feet away from the anhydrous ammonia tank. *Id.* Burns then began to wonder whether the Mahle facility itself, portions of which were within 300 feet of the tank, could be considered a private or public assembly. Burns contacted Zabrodsky for a definition of "private or public assembly," but he explained that he could not find one. PageID 237-39. Burns did not discuss the issue with Mahle's company counsel but did speak to a private attorney who recommended that she note on the revised application that "public or private assembly" lacked a definition. PageID 574-79.

Following this advice, in her updated permit application, Burns added a handwritten comment to her response regarding the distance to certain structures, explaining, "[a]s no clear definition has been given of 'private or public assembly' the attached picture shows the locations of nearest residence, factory, and lodge. No identified schools, apartments or other institutions." PageID 312. Burns also included an aerial photograph that listed the distance between the tank and other structures. On March 29, 2012, Burns emailed the revised permit application to Aubry and Knodel for their review. Knodel recommended that she submit the application without the additional comment or aerial photo but that she keep them on file should MDEQ later require

- 3 -

them. Later that day, Aubry met with Burns and explained that he had concluded her additions were unnecessary and might appear as hedging since all of the information was redundant. Aubry indicated that Burns could still attach the photo but asked Burns to remove her note and then submit the permit application.

Because he knew that Burns was concerned about her personal liability, Aubry put his instructions in writing and emailed them to Burns the next day. Burns emailed back that she was still uncomfortable playing a "guessing game" with something as dangerous as ammonia and that she would not sign the permit without the additional information. PageID 327. Aubry sent Burns a second email stating:

> We all agree that ammonia can be dangerous. And I think you agree that we have more than adequate safeguards in place to minimize if not eliminate the risk. We disagree that this is playing a guessing game. You acknowledged in your preliminary permit and in our discussion yesterday that [M]DEQ's regulations are unclear as to the definition of private and public assemblies.
>
> Why do you feel compelled to try and define this for [M]DEQ?
>
> Please delete the asterisk and the asterisk reference before you submit the permit today. If you're unclear as to what I'm requesting, please call me.

PageID 326. Burns still refused, explaining "[s]orry, but I am going to seek outside council [sic] and find out what my liability is before signing that permit." PageID 325. Burns also copied Plant Manager Fandel on this email and explained that he was authorized to sign and submit the permit application were he so inclined.

Aubry met with Burns again on April 4, 2012 to explain why he wanted to remove her addition and to ask Burns to delete the comment and submit the application. When Burns declined, Aubry summoned another HR representative to serve as a witness. Aubry then explained that if Burns still refused to sign the application, this refusal would constitute insubordination and result in her indefinite suspension. Burns refused to sign or submit the

permit. Aubry then suspended Burns for gross insubordination. After she was suspended, Burns called Ralph Williams—an Environmental Health & Safety Coordinator at Mahle's facility in Morristown, Tennessee. Burns claims she told Williams, among other things, that she was going to call Michigan's Occupation Safety and Health Administration ("MIOSHA"). Williams does not recall whether Burns told him that she planned to call MIOSHA. Burns claims that she contacted MIOSHA on April 4, after she hung up with Williams.

After suspending Burns, Aubry discussed Burns's misconduct with Fandel and Dennis Wheeler, Mahle's Director of Human Resources for North America. They agreed that Burns's conduct constituted gross insubordination, which, under Mahle's employment policies, is a ground for termination. On April 5, 2012, Mahle terminated Burns. Williams played no part in the decision to terminate Burns; moreover, Williams did not tell Aubry, Fandel, or Wheeler that Burns had said she intended to contact MIOSHA. On the evening of April 5, Burns sent MIOSHA an email chain related to the permit application. Burns continued to pursue her MIOSHA complaint, alleging that she was wrongfully terminated for refusing to sign the permit application in violation of Michigan's Occupational Safety and Health Act, until October 17, 2012, when MIOSHA determined that Burns's allegations "could not be sustained" and dismissed her complaint. PageID 449-56.

On April 11, 2012, MDEQ denied the original permit application that Burns had submitted. After Burns's termination, Mahle submitted the revised permit application without either Burns's comment or the aerial photograph. PageID 204, 306, 471-482. On July 12, 2012, MDEQ granted the permit, noting that the "application has been determined to be complete . . . ." PageID 471.

On June 28, 2012, Burns filed this diversity suit in the United States District Court for the Western District of Michigan, alleging (1) that Mahle violated Michigan's Whistleblower Protection Act by terminating her because she contacted MIOSHA to report that she had been suspended for refusing to sign the permit application and (2) that Mahle violated Michigan public policy by firing her for refusing to sign the permit application. Mahle moved for summary judgment on both of Burns's claims on May 15, 2013. The district court granted Mahle's motion on September 13, 2013. Burns timely appealed.

II.

We review de novo a district court's grant of summary judgment using the *Matsushita-Anderson-Celotex* standard. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We do not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which it must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party may not "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578

F.3d 351, 374 (6th Cir. 2009) (citing Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 586). A party asserting a genuine issue of material fact must support this argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson*, 477 U.S. at 248-52. If there are no disputed material facts, we review de novo whether the district court properly applied the substantive law. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2003).

## III.

Burns contends that the district court erred in dismissing her Michigan Whistleblower Protection Act ("WPA") claim because she had, in fact, furnished sufficient evidence to establish a causal connection between her contacting MIOSHA and her termination. She also asserts that the district court erred in dismissing her common-law claim because genuine issues of material fact exist regarding her allegation that her discharge contravened Michigan public policy.

## A.

The WPA provides that:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362. To prevail on a WPA claim, a plaintiff must "show by clear and convincing evidence that he or she or a person acting on his or her behalf was about to report,

verbally or in writing, a violation or a suspected violation of a law of this state, a political subdivision of this state, or the United States, to a public body." Mich. Comp. Laws § 15.363(4). "The WPA, as a remedial statute, is to be liberally construed to favor the persons the Legislature intended to benefit." *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 215 (Mich. 1998).

We analyze claims under Michigan's WPA using the burden-shifting framework for retaliatory discharge claims under the Elliot Larsen Civil Rights Act. *See Taylor v. Modern Eng'g, Inc.*, 653 N.W.2d 625, 628 (Mich. Ct. App. 2002); *accord Pethers v. Metro Lift Propane*, No. 09-CV-10516, 2010 WL 3023887, at *6 (E.D. Mich., July 29, 2010). Under this framework, the plaintiff first must establish a prima facie case under the WPA. *E.g. West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471-72 (Mich. 2003). Once a plaintiff has made this showing, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its adverse employment action. *E.g. Roulston v. Tendercare (Michigan), Inc.,* 608 N.W.2d 525, 530 (Mich. Ct. App. 2000). If the defendant proffers a legitimate, non-retaliatory reason, the plaintiff then has the opportunity to prove that the defendant's purported legitimate reason was merely pretext for the discharge. *Taylor*, 653 N.W.2d at 628 (citing *Roulston*, 608 N.W.2d at 530).

Burns argues that the district court erred in holding that she could not establish a prima facie case. To make a prima facie WPA case, Burns must show: (1) that she was engaged in a protected activity under the WPA; (2) that she was discriminated against or discharged; and (3) that there is a causal connection between the protected activity and the adverse employment action. *West*, 665 N.W.2d at 471-72. WPA-protected activities include both reporting a violation of a law, regulation, or rule to a public body and being about to report such a violation.

*See Chandler*, 572 N.W.2d at 212. Neither party disputes that Burns engaged in a protected activity under the WPA. Similarly, the parties agree that Mahle's terminating Burns satisfies the second prong. Burns and Mahle, however, disagree about whether Burns can establish a causal connection between her either calling or being about to call MIOSHA and her termination.

The district court concluded that "Burns's claim falters on the third prong." PageID 739. The district court reasoned that because the three people who decided to terminate Burns's employment did not know of her protected activity, their decision could not have been motivated by her protected activity. *Id*. On appeal, Burns contends that she can establish a causal connection between her protected activity and her termination by establishing that Mahle had notice that she was going to call MIOSHA. To support her argument, Burns relies on her telling Williams that she intended to call MIOSHA, coupled with the "suspicious timing" of her threat to contact MIOSHA one day and her termination the next.

For there to be causal connection between an adverse employment decision and a protected activity, the relevant decision-maker must have actual knowledge of the protected activity before making the decision. *See Kaufman & Payton, P.C. v. Nikkila*, 503 N.W.2d 728, 732-33 (Mich. Ct. App. 1993); *see also Jennings v. Cnty. of Washtenaw*, 475 F. Supp. 2d 692, 713 (E.D. Mich. 2007) (explaining that an about-to-report WPA claim "requires evidence showing that, before firing [the plaintiff], the person responsible for her termination was aware that she was about to make a report to a public body"). Thus, for Burns to establish causation, she must demonstrate that at least one of the people responsible for her termination was aware of her plan to contact MIOSHA.

Although Burns may have told Williams about her plan to contact MIOSHA, Williams had nothing to do with the decision to terminate Burns. Burns does not appear to contest that

Aubry, Fandel, and Wheeler, not Williams, were responsible for her termination. Moreover, the record is devoid of any evidence that Williams notified Aubry, Fandel, or Wheeler of Burns's protected activity. Nothing in the depositions of Aubry, Fandel, Wheeler, or Williams indicate that Williams told any of the decision-makers that Burns planned to contact MIOSHA, and even Burns concedes that she does not have any information regarding whether Williams notified Aubry, Fandel, or Wheeler.

To circumvent the fact that Aubry, Fandel, and Wheeler did not know about her protected conduct, Burns relies on *dicta* in an unpublished Michigan Court of Appeals decision, *Koller v. Pontiac Osteopathic Hosp.*, No. 229630, 2002 WL 1040339 (Mich. Ct. App. May 21, 2002) (*per curiam*), for the proposition that Michigan law imputes constructive knowledge of a protected activity to a decision-maker when an employee notifies any management-level employee that she is "about to report" to a public body. As the district court correctly noted, however, Burns's reliance on *Koller* is misplaced. As a constructive discharge, hostile work environment case, *Koller* is distinguishable because it lacks decision-makers analogous to Aubry, Fandel, and Wheeler. *Koller*, 2002 WL 1040339, at *3. Moreover, even if it were on point, the ultimate holding in *Koller*—that the plaintiff failed to demonstrate that she engaged in a protected activity and also failed to establish causation—runs counter to Burns's own arguments. *See id.* at *3-*4.

Because none of the people who made the decision to terminate Burns was aware of her protected activity, that activity could not have been the impetus for their decision to terminate her. *See West*, 665 N.W.2d at 471-72; *Kaufman & Payton PC*, 503 N.W.2d at 732-33.

Accordingly, the district court did not err in finding that Burns failed to demonstrate causation and thus failed to establish a prima facie claim under the WPA.[1]

B.

Burns also argues that the district court erred in granting Mahle summary judgment on her claim that her discharge violated public policy. Because Burns was an at-will employee, Mahle could terminate her employment at any time or for any reason, so long as that termination was not contrary to public policy. In *Suchodolski v. Michigan Consolidated Gas Co.*, 316 N.W. 2d 710 (Mich. 1982), the Michigan Supreme Court noted three public policy exceptions to an employer's right to discharge an at-will employee, where: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment. *E.g. McNeil v. Charlevoix Cnty.*, 772 N.W. 2d 18, 24 (Mich. 2009) (citing *Suchodolski*, 316 N.W.2d at 711–12). Burns invokes the second exception, arguing that Mahle fired her when she refused to sign the permit application without the additional handwritten comment because doing so would render the application less than true, accurate, and complete and thereby violate Michigan's Occupational Health and Safety Act, Mich. Comp. Laws §§ 408.1001-1094, and Natural Resources Protection Act, Mich. Comp. Laws §§ 324.5501-324.5542.

The record does not support Burns's claim that Aubry's request to remove her handwritten footnote was a request to violate the law. Burns concedes that "all the information"

---

[1]Based on this holding, we need not determine whether the district court erred in concluding that, even if Burns could make a prima facie WPA case, she could not demonstrate that Mahle's stated legitimate, non-retaliatory reason for her discharge—her gross insubordination—was pretextual.

in her written addition to the application to which Aubry objected "would already be somewhere else" in the application form.  PageID 260.  Thus, removing the additional comment would not have rendered the application inaccurate or incomplete—a fact validated by MIOSHA's deeming the application complete and approving it without either the additional comment or the aerial photograph that Aubry had permitted Burns to attach.  Moreover, Burns herself had already signed and submitted an earlier version of the permit application without the additional information.  Indeed, had Burns actually measured the distances before submitting the first application, rather than "guestimat[ing]," the initial application—which but for the distance measurements was identical to the revised application—would have been approved and the entire confrontation regarding Burns's desired additions would have been avoided.  Because there is no basis to conclude that Mahle's instructions to submit the permit application without the additional note was an illegal request, the district court did not err in ruling that Mahle did not ask Burns to violate a law or terminate her employment for refusing to do so.

IV.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Mahle on all of Burns's claims.