# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL RAMSEY and GLENN DOWDY,

        Plaintiffs-Appellants,

v

LABORERS' LOCAL 1191, doing business as
ROAD CONSTRUCTION LABORERS OF
MICHIGAN LOCAL 1191, and MICHAEL
AARON,

        Defendants-Appellees,

and

BRUCE RUEDISUELI,

        Defendant.

UNPUBLISHED
May 23, 2017

No. 329920
Wayne Circuit Court
LC No. 10-004708-CD

Before: M. J. KELLY, P.J., and BECKERING and SHAPIRO, JJ.

PER CURIAM.

        Plaintiffs, Michael Ramsey and Glenn Dowdy, appeal as of right the trial court's order granting summary disposition for defendants, Laborers' Local 1191 (Local 1191) and Michael Aaron, under MCR 2.116(C)(10) on their claims of retaliatory discharge under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, and Ramsey's claim for discharge in violation of public policy.[1] For the reasons stated in this opinion, we affirm the trial court's dismissal of Ramsey's public policy claim, but reverse the court's decision to dismiss plaintiffs' WPA claims.

---

[1] Ramsey and Dowdy's claims against defendant Bruce Ruedisueli were dismissed after the parties accepted the case evaluation award. Therefore, references to "defendants" refer only to defendant-appellees, Aaron and Local 1191.

-1-

# I. BASIC FACTS

Local 1191 is a labor union representing construction workers. On May 1, 2009, defendant Aaron was appointed as the business manager of the union after his predecessor resigned. At that time, defendant Bruce Ruedisueli served as the elected president of the union's executive board. The union also employed several unelected business agents who served at the pleasure of the business manager. At all times relevant to this appeal, plaintiffs Ramsey and Dowdy were both members of the union's executive board and were business agents. When Aaron was appointed business manager, he continued intermittent or rolling layoffs of the business agents as a cost-saving measure related to the 2008 economic downturn's effect on union dues. In addition, he had the business agents affirm their at-will status by signing resignation letters with a blank effective date.

It appears that not everyone in the union was happy with Aaron's management. There is evidence that starting in August or September 2009, several union members met in secret to discuss their discontent with Aaron as business manager.[2] The members present at those meetings included plaintiffs, Ruedisueli, Anthony Henry, Keith White, Duane Robinson, Tony Garza, and Jimmy Cooper. At the meetings, they apparently discussed whether they could oust Aaron as business manager and replace him before the June 2010 union election. At some of the meetings, there were also discussions about running a slate against Aaron in the upcoming election. It appears that, in September 2009, a main topic of discussion at the meetings was Aaron's allegedly illegal conduct related to a job at the Trade Union Labor Council (TULC).[3] At

---

[2] There is some confusion in the record as to what month the secret meetings began. White testified that the meetings first started in August 2009. Dowdy, however, expressly testified that the first meeting occurred in September 2009, then, later in his testimony he impliedly agreed that there were meetings that occurred before September 2009. When asked to clarify his testimony, he testified that he had never attended any meetings before September 2009 where he "talked politics." He also asserted that the first time he met with White, Henry, Cooper, or anyone else was after the Trade Union Labor Council (TULC) job was completed.

[3] In September 2009, Aaron coordinated a project in which unemployed members of Local 1191 removed a crumbling brick façade at the TULC building. According to defendants, TULC "is a non-profit community, charitable and civil rights organization that provides, among other things, job training and community and social services." Defendants contend that they informed workers before they came that they would be doing volunteer work or community service for TULC. Plaintiffs assert that the workers were falsely informed that Local 1191 was holding a training session and that the workers learned only after they arrived that that they would be working on the TULC building. Defendants deny that any worker was required to work on the TULC project. Regardless, it is undisputed Local 1191 paid the workers a $30 daily stipend for two days of work. The workers' checks had the notation "Picket Line 2 Days" written on the memorandum line, which refers to a fund used to pay striking workers a daily stipend for picket line participation. Ruedisueli signed the checks, although he was concerned that the "picket line" notation was false.

one of the meetings, a letter drafted by Henry regarding the allegedly illegal and unethical actions taken by Aaron in relation to the TULC job was discussed by the group.

On September 25, 2009, the letter was sent anonymously to the union's membership, its executive board, and local news outlets. The letter suggested that Aaron was involved in criminal activity, including fraud, an illegal kickback scheme, and misappropriation of union funds. It also insinuated that Local 1191 required the members at the TULC building to work without receiving proper wages.[4] The letter was read aloud at the executive board meeting, and it was determined that the allegations would be investigated.

In October 2009, Ramsey, Henry, and White contacted the United States Department of Labor with their suspicions as it related to Aaron's actions regarding the TULC job. Subsequently, on November 11, 2009, Aaron notified Henry and White that they were indefinitely laid off from employment at Local 1191. Aaron asserted that the reason for the layoffs was the "extremely difficult economic climate." Henry and White, however, believed that they were terminated because of their report of suspected illegal activity to the Department of Labor. They both filed suit against Aaron, Ruedisueli, and Local 1191, asserting that they had been discharged in violation of the WPA.

During discovery in the Henry/White lawsuit, in March 2010, Aaron learned for the first time that Ramsey had also reported the suspected illegal activity regarding the TULC job to the Department of Labor. And, although he already knew that Dowdy had been interviewed by the Department of Labor in connection with the TULC job in either late December 2009 or early January 2010, he learned for the first time that Dowdy believed that Aaron's involvement in the TULC job was illegal. A few weeks later, on April 9, 2010, Aaron terminated Ramsey's and Dowdy's employment as business agents at Local 1191. Ramsey and Dowdy filed suit against Aaron, Ruedisueli, and Local 1191, asserting that they were discharged in violation of the WPA, and, in Ramsey's case, that he was also terminated in violation of public policy because he had refused to lie during his deposition.

In both the Henry/White lawsuit and the instant action, defendants moved for summary disposition under MCR 2.116(C)(4), on the grounds that the Federal Labor Management Reporting and Disclosure Act, 29 USC 401 *et seq.*, and the National Labor Relations Act, 29 USC 151 *et seq.*, preempted the state law claims. The trial court denied the motions, and this Court affirmed that decision. *Henry v Laborers' Local 1191*, unpublished opinion per curiam of the Court of Appeals, issued July 3, 2012 (Docket Nos. 302373, 302710). Defendants appealed to our Supreme Court, which affirmed this Court's decision in part, holding that this Court "correctly determined that federal law did not preempt plaintiffs' WPA claims premised on their allegations of criminal misconduct," but that plaintiffs' claims of unlawful retaliation for reporting improper wages and unsafe work environment "must be litigated exclusively" before the National Labor Relations Board. *Henry v Laborers' Local 1191*, 495 Mich 260, 268-268, 297; 848 NW2d 130 (2014). The Supreme Court remanded the case to the trial court and stated,

---

[4] During the proceedings, it was also alleged that the workers at the TULC job site were required to work without proper safety precautions, such as hard hats and steel-toed boots.

"Going forward, plaintiffs may only pursue in state court their WPA claims involving retaliation for their reporting of alleged illegal conduct to a public body or bodies." *Id.* at 297.

The Henry/White litigation settled and was dismissed with prejudice by stipulation.

In the instant case, defendants moved for summary disposition under MCR 2.116(C)(10). Defendants assumed for the purposes of their motion that Ramsey and Dowdy could establish that they engaged in a protected activity and that they suffered an adverse employment decision; however, defendants argued that Ramsey and Dowdy could not show a causal connection between their participation in a protected activity and the adverse employment decision. The trial court agreed and granted the motion for summary disposition.

## II. SUMMARY DISPOSITION

## A. STANDARD OF REVIEW

Ramsey and Dowdy argue that the trial court erred by granting summary disposition because there was a question of fact as to whether they were discharged in violation of the WPA. We review de novo a trial court's decision to grant summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition may be granted under MCR 2.116(C)(10) when "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." This Court must consider any evidence submitted by the parties and view that evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Maiden,* 461 Mich at 120. A genuine issue of material fact exists when the record leaves open "an issue upon which reasonable minds might differ." *Debano–Griffin v Lake Co,* 493 Mich 167, 175; 828 NW2d 634 (2013) (citation and quotation marks omitted).

## B. WHISTLEBLOWERS' PROTECTION ACT

The WPA provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [MCL 15.362.]

"Under the WPA, a plaintiff may establish a prima facie case by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) 'a causal connection exists between the protected activity' and the adverse employment action." *Debano-Griffin*, 493 Mich at 175,

-4-

quoting *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). The first two requirements are not disputed on appeal.[5]

In order to establish a causal connection between the protected activity and the adverse employment action, a plaintiff must show "[s]omething more than a temporal connection between protected conduct and an adverse employment action . . . ." *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003). However, evidence that the direct recipient of a plaintiff's complaint is the same individual that made the decision to discharge the plaintiff "strengthens the causal link between plaintiff's protected activity and defendants' adverse action because it is reasonable to infer that the more knowledge the employer has of the plaintiff's protected activity, the greater the possibility of an impermissible motivation." *Debano-Griffin*, 493 Mich at 178. Likewise, "it is reasonable to conclude that the more an employer is affected by the plaintiff's whistleblowing activity, the stronger the causal link becomes between the protected activity and the employer's adverse employment action." *Id*. In addition, evidence that an employer "expressed clear displeasure with the protected activity engaged in by the plaintiff" can also support an inference that there is a causal connection between the protected activity and the adverse employment action. *West*, 469 Mich at 186-187, citing *Henry v Detroit*, 234 Mich App 405, 414; 594 NW2d 107 (1999). A plaintiff is not required to rely on direct evidence of an employer's unlawful motivations and may instead rely on indirect evidence "to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin*, 493 Mich at 176.

Defendants assert that Ramsey and Dowdy cannot establish a causal connection between their protected activity and Aaron's decision to fire them because they both admitted in their depositions that they did not know of any facts showing that Aaron fired them for their involvement with the Department of Labor regarding the TULC job. Ramsey reported his suspicions that the TULC incident involved illegal activity to the Department of Labor in October 2009, but he was not terminated until April 2010. Dowdy was interviewed in connection with the TULC incident in either late December 2009 or early January 2010, but was not terminated until April 2010. Defendants argue that, as a result, the temporal proximity between Ramsey's protected activity and the adverse employment action was about six months, whereas the time between Dowdy's protected act and the adverse employment action against him was about three or four months. However, the record reflects that Aaron, the individual solely responsible for firing them, first learned of Ramsey's report to the Department of Labor and the scope of Dowdy's interview in March 2010. Then, within a few weeks of learning of the protected activity, Aaron terminated their employment. The timing could allow a factfinder to reasonably infer that Ramsey and Dowdy were the victims of unlawful retaliation. See *Debano-Griffin*, 493 Mich at 176. Moreover, the fact that the TULC accusations were directed at

---

[5] For the purpose of this opinion, we assume without deciding that Ramsey engaged in a protected activity when he reported Aaron's actions with regard to the TULC incident to the Department of Labor and that Dowdy engaged in a protected activity when he participated in the Department of Labor's subsequent investigation. See *West v Gen Motors Corp*, 469 Mich 177, 184 n 9; 665 NW2d 468 (2003).

Aaron's allegedly illegal conduct and the fact that he was the individual solely responsible for firing them further strengthens the causal connection in this case. See *id.* at 178. In addition, Aaron testified that when he heard TULC letter read at the executive board meeting, he was aggravated. He added that, a week later, he was still very aggravated. He stated that when Ruedisueli tried to question him about the letter he "asked him to get out of my office." He also indicated that when the union lawyer asked him whether he received a kickback he was "pissed" with the lawyer. Because the report to the Department of Labor and subsequent investigation involved the TULC job and the same allegations raised in the letter that aggravated Aaron, it is reasonable to infer that Aaron was also angry about the incident being reported to the Department of Labor. Also relevant to whether there is a causal connection in this case is the fact that the only business agents who were fired or laid off after the TULC incident were the individuals who Aaron knew had contact with the Department of Labor.[6]

When viewed in a light most favorable to Ramsey and Dowdy, the foregoing facts support a reasonable inference that they were the victims of an unlawful retaliation as a result of their decision to engage in a protected activity. Therefore, Ramsey and Dowdy established their prima facie case. Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant employer to offer a legitimate reason for the adverse employment action. *Id.* Here, Aaron asserted that he fired Ramsey and Dowdy for disloyalty and deceit. In particular, he notes that in March 2010, he first learned that Ramsey and Dowdy were part of a group of members who began secretly meeting and plotting his ouster in August 2009—before the TULC allegations arose.[7] Further, Aaron stated that Ramsey and Dowdy told him that they supported him, which, in light of their plotting to oust him, was clearly a lie. Defendants correctly note

---

[6] Duane Robinson, one of the business agents involved in the secret meetings, testified that he was told by a union member, Roy Mathis, that Aaron told Mathis that he was "going to handle his business" and "was going to make them pay for what they had done" with regard to the TULC allegations. Robinson stated that Mathis was not clear on who "they" were, but he assumed it meant the people responsible for creating the TULC problem for Aaron. We do not consider this testimony on appeal because, although Aaron's statements constitute a party-opponent admission and are admissible under MRE 801(d)(2), Mathis's purported statements to Robinson appear to be hearsay for which no exception applies. See generally MRE 803 and MRE 804. The presentation of inadmissible hearsay evidence on a motion for summary disposition under MCR 2.116(C)(10) is merely a promise "to create an issue for trial where the promise is incapable of being fulfilled." *Maiden*, 461 Mich at 123 n 5. Accordingly, we do not consider this testimony on appeal. Nevertheless, should the case proceed to trial, we see no bar at present to Mathis testifying to any relevant statements that Aaron made to him.

[7] Again, there is testimony that the meetings started in August 2009 and there is also testimony that they did not start until September 2009. Because Aaron purportedly relied on White's testimony that they started in August 2009 when he determined that there were meetings before the TULC allegations arose, we must evaluate his claimed reason for terminating Ramsey and Dowdy's employment in light of the earlier date.

-6-

that, because Ramsey and Dowdy were at-will employees, he had a right to fire them for any reason, including for their disloyalty.

That does not end our inquiry, however. A plaintiff may rebut an employer's facially legitimate reason for its adverse action by showing that the stated reason is merely a pretext for the unlawful retaliatory discharge. *Roulston v Tendercare (Mich), Inc*, 239 Mich App 270, 281; 608 NW2d 525 (2000). In looking at whether a plaintiff can show that a stated reason is merely a pretext for unlawful retaliation, a court may consider:

> (1) whether participation in the protected activity played any part in the discharge, no matter how remote, (2) whether the plaintiff's protected activity was a substantial factor in the discharge, (3) whether the plaintiff's protected activity was the principal, but not sole, reason for the discharge, or (4) whether the discharge would have occurred had there been no protected activity. A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. [*Id*.]

Further, a plaintiff can show pretext "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision . . . ." *Dubey v Stroh Brewery Co*, 185 Mich App 561, 565-566; 462 NW2d 758 (1990). Here, defendant's stated reason for discharging Ramsey and Dowdy has a basis in fact. Ramsey and Dowdy were participating in secret meetings to oust Aaron as business manager, and they concealed their involvement. Nevertheless, Ramsey and Dowdy have come forward with evidence showing that their disloyalty and deceit were not the actual motivating factors for terminating their employment. Several employees participated in the secret meetings to oust Aaron as business manager. The four business agents that were subsequently fired were Ramsey, Dowdy, Henry, and White, all of whom either reported or were involved in the Department of Labor's investigation of the TULC job. The other business agents, Robinson, Garza, and Ruedisueli, however, were not terminated despite the fact that they were also disloyal when they participated in the secret meetings. Moreover, although Aaron testified that Ramsey and Dowdy's involvement with the Department of Labor was not a basis for his decision to terminate their employment, he also indicated that Ramsey's disloyalty encompassed his denial of knowing anything about the issues raised about TULC. Therefore, viewing the facts in the light most favorable to plaintiffs, there is a jury submissible question on whether the stated reasons were merely a pretext for an unlawful retaliation.

## C. DISCHARGE IN VIOLATION OF PUBLIC POLICY

Ramsey also claims that his discharge was contrary to public policy. Generally, employment contracts are terminable at will by either party. *Suchodolski v Mich Consol Gas Co*, 412 Mich 692, 694-695; 316 NW2d 710 (1982). "However, an exception has been recognized to that rule, based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id*. at 695. This exception includes discharge of an employee for the reason that the employee failed or refused "to violate a law in the course of employment." *Id*. Ramsey contends that Ruedisueli asked him to testify falsely in his deposition and that, after he refused to do so, he was terminated from employment. However, Ruedisueli,

not Aaron, requested that Ramsey violate the law against perjury by giving false testimony to conceal Ruedisueli's disloyal conduct from Aaron. There is no factual basis for inferring that Aaron discharged Ramsey for refusing to give perjured testimony when that perjury would have been for Ruedisueli's benefit and to Aaron's detriment. Ramsey's assertion that Ruedisueli influenced Aaron to discharge Ramsey relies instead on pure conjecture. Accordingly, defendants were entitled to summary disposition on this claim.

Reversed and remanded in part and affirmed in part. We do not retain jurisdiction. Neither party having prevailed in full, we decline to award costs pursuant to MCR 7.219.

/s/ Michael J. Kelly
/s/ Jane M. Beckering
/s/ Douglas B. Shapiro